Brower *et al. v.* The East Rome Town Company.

1. This litigation involving two controlling questions, one of law, the other of fact, and both being settled, the former by this court in causing a new trial to be had, and the latter by a correct verdict rendered on the new trial, errors, if any, in the charge of the court are immaterial.

2. The minutes of the corporation touching the contract in question were admissible in evidence under the special circumstances, though the entries were not made in the book until several months after the meeting at which the proceedings took place.

3. Objection to the verdict as to the time from which interest ought to have been computed, is not available in the Supreme Court where it does not appear that the point was made in the court below, and where the evidence as brought to the Supreme Court is not full enough to enable this court to ascertain the correct time.
January 10, 1890.

Deeds. *Res adjudicata.* Evidence. Practice. Verdict. Before Judge MADDOX. Floyd superior court. March adjourned term, 1889.

The East Rome Town Company brought its bill against A. T. H. Brower and Josephus Estes, on June 2, 1885, to reform a deed dated June 8, 1878, from the company to Brower, and to recover possession of certain premises therein described, with rents, etc. It was alleged that Brower, then the president of the company, fraudulently procured to be inserted in the deed a clause qualifying a reservation therein. The deed conveyed certain land lying on the Etowah river, the company "reserving the bridge-keeper's house and the ground now enclosed therewith as a garden to be used as a residence for the bridge-keeper." Then follows the qualifying clause alleged to have been wrongfully inserted, thus: " Should this cease to be used for such purposes,

said house and property to be the said A. Thew H. Brower's." The deed was signed by "A. Thew H. Brower, president," and "Hugh D. Cothran, secretary." The bridge alluded to was formerly the property of the company, but in 1883 was sold and delivered to Floyd county to be used as a free bridge, reserving the toll-keeper's houses and premises, which were occupied by Estes as the tenant and employé of the company. Since this sale Brower has claimed title to this house and premises under his deed, and Estes has accounted and attorned to him. They refuse to acknowledge the company's right, or to account to it for rents, etc.

On the trial, the following facts appeared in evidence : It was provided in the company's by-laws that the president should make and sign all contracts, bonds and deeds respecting sales of lots, and should attend generally to the business of the company and employ agents ; but should make no sale or covenant involving a sum exceeding two thousand dollars, without the concurrence of those representing a majority of the stock. Also that all deeds or bonds for title should be signed by the president and countersigned by the secretary. Also that the secretary and treasurer should keep a book of the minutes of the stockholders' meetings, etc., to be open at all times to the inspection of any member of the company. At the organization of the company, the by-laws were written in the original book of minutes, which has been used ever since, and has at all times been subject to the inspection of persons interested in the company. These minutes showed, under date of October 8, 1877, that at a meeting of the stockholders of the company, at which Brower, G. W. Nagle and H. M. Smith, trustee, were present, the following proposition of Brower was accepted : Brower to pay $3,000 in three years for the land described in his deed, "the company reserving the land occupied by the bridge-keeper's

house and used by the bridge-keeper for garden, etc. at this time." On the 17th of the same month, the company's bond for title was given to Brower, the same being executed by R. T. Fouché, then the president, and Hugh D. Cothran, secretary. After describing the land, this bond contains this clause : " The East Rome Town Company, however, reserving the bridge-keeper's house and the ground enclosed therewith at this date as a garden to be used only as a residence for the bridge-keeper ; should this cease to be used for such purposes, said house and ground to be the property of said A. Thew H. Brower." Under date of December 15, 1877, the minutes show that at a meeting of all the stock-holders of the company, the entire stock (500 shares) being represented, R. T. Fouché tendered his resignation as president, which was accepted ; and on motion of H. M. Smith, Brower was unanimously elected to that office. It appears that he then represented 247 shares of the stock. Under date of June 8, 1878, at a meeting of the stockholders at which Brower, Adams, Nagle and Smith were present, it was unanimously agreed to " issue title " to Brower to the land bought by him, upon his paying $2,400 cash in lieu of the $3,000 previously agreed to be paid in three years ; and the secretary was directed to make the necessary deed, have it executed and delivered to Brower, and receive the $2,400. The deed was executed as stated in the first part of this report. The secretary of the company endorsed on it : " This deed is executed this day in accordance with instructions given by the stockholders at a called meeting held at the Bank of Rome on the above named day . . . all the stock being represented excepting thirty-four shares standing in the name of R. T. Fouché." This deed was recorded June 13th, 1878. Two other extracts from the minutes were introduced, showing that at a meeting held June 22,

1876, there were present Brower, representing 232 shares, Fouché (by Brower as proxy) representing 34 shares, Adams 92 shares, and Nagle 62 shares; and at a called meeting on March 28, 1881, there were present Brower, representing 328 shares, Adams 16 shares, Nagle 62 shares, Fouché 34 shares, and Smith, trustee, 60 shares. This last meeting was held at the bridge-house in East Rome; all the others at the Bank of Rome.

The testimony for the complainant, by Cothran, Smith, Fouché, Nagle and three other witnesses, tended to show the following: Cothran was secretary of the company at the time of the meetings touching the transaction in question, but was not present; was cashier of the bank of Rome, of which Brower was president, and both could not leave the bank. The meetings were held in the rear room of the bank, and if Cothran were wanted he was called. Brower was present at the meetings and took down memoranda of the minutes; and he handed these memoranda to Cothran, with direction to copy them into the minute-book as the minutes of the meeting. They were placed in that book, but not copied until six or eight months afterwards, or after the deed to Brower was made. Brower voted the stock represented by him (232 shares at one time and 247 at another); it stood in his name on the books; the Bank of Rome did not vote. Brower also owned about two thirds of the stock of the Bank of Rome, and in 1879 bought the remainder. The clause in the deed was not noticed by, and was unknown to, the members of the company until after the sale of the bridge to the county, although Cothran copied the deed as well as the bond for titles. The corresponding clause in the latter must have been known to Fouché when he signed it, as he testified. Cothran did not think of it. In January, 1884, one of the stockholders inquired

what should be done with the bridge-house, and Brower then claimed that it belonged to him. The minutes of October 8, 1877, embrace all the terms of acceptance of Brower's offer of purchase; and those of June 8, 1878, show the action of the stockholders intended to carry out the contract with him, and that only. It was the practice to have the minutes of the last meeting read and confirmed, or altered to make them comply with the facts. The reversionary clause was unauthorized and unknown to the stockholders other than Brower. Cothran became president of the company in 1885. Brower, while occupying that office, expended about $1,200 of the company's money in making improvements on the toll-house. When he brought the property, this house was an ordinary one of two or three rooms. Since January, 1884, it has been worth fifteen or more dollars per month for rent.

For the defendant a witness testified that the rents realized from the house since March, 1887, had been between four and five dollars per month; that it is impossible to get a good tenant on account of the location; and that the taxes on it are about twenty-five dollars per year.

Brower testified: The Bank of Rome, of which I was the principal stockholder, owned 247 shares of the stock of the company, and by agreement of the other stockholder of the bank I had the privilege of receiving all dividends declared on 232 shares of this stock. I told Cothran what offer I would make for the property conveyed by the deed; discussed the whole matter with him before the deed was made, and among other things distinctly told him I would not make the purchase unless the bridge-house and lot on which it stood should revert to me if the bridge ever became a public one and the house therefore no longer occupied by a toll-taker. I did not attend the meeting of the company at the

time I made the purchase. Cothran made my proposition, and after the meeting informed me that the company had accepted it. Before I gave my notes, I distinctly stated that I would not take the property at any price unless I had the bridge-house in case the bridge was ever sold to the public, for the reason that if any other than I owned the house when the bridge was public, it would probably become a public house and a nuisance to the residents and to my property. I stated all I have said to Cothran and Adams (who was Fouché's predecessor as president of the company). Adams kept all the books and papers of the company in a box which was deposited in the bank. I never read the minutes of the company or any of its rules or by-laws, and never touched the papers in that box, until just before I was made president. I had taken no interest in the management of the company; though really I owned stock, I was trying to sell the same. According to my best recollection, Cothran represented the Bank of Rome at the meeting of the company at which my offer to pay cash and take the deed was accepted; made the offer on my behalf, and after the meeting adjourned, came out and drew up the deed; I was not present. After drawing the deed, he showed it to me, and I told him that the wording by which the bridge-house should revert to me in case the bridge was sold, was not sufficiently clear, and that I would not accept it. Thereupon he drew a new deed, which was acceptable to me and which is the deed I now have. It was then sent by him to Fouché, who returned it duly acknowledged and in proper form. The meetings of the company were generally held in the back office of the bank until after 1879, when I had sold out that bank. The custom that prevailed in the management of the company's affairs was to make out the minutes in the course of the meetings on any blank

sheet of paper; and frequently these memoranda were pinned to a page in the minute book and not copied until weeks or months afterwards. After I became president of the company, I consulted with Adams, the next largest stockholder as to the necessity of repairing the bridge-house for the use of the company as an office, and for the better and necessary comfort of the bridge-keeper. Adams agreed with me, and told me he had talked with Smith and others, and they approved of the building of this office as a part of the improvement of the house. We then had no idea that the bridge would be bought for the public. The company needed an office; and we calculated that by making this addition instead of hiring an office in Rome, we would in two years save enough to more than pay for it; and the addition would be beneficial to the rest of the company's property in East Rome. Cannot state the amount of rents I have received, or of taxes and insurance I have paid, not having memoranda of the same at hand.

The jury found "for the complainant, and rents $664, with interest at 7 per cent. from Jany. 1st, 1884, and that the deed be reformed according to the prayer of the bill. This Sept. 28th, 1888." The defendant moved for a new trial on the grounds that the verdict was contrary to law and evidence; for alleged errors in the charge of the court, not material here; and because the court erred in admitting in evidence the minutes of the complainant, over defendant's objections that they were mere sayings of the company in its own favor, and that they were not proved to have been properly and correctly kept. The motion was overruled, and the defendant excepted.

C. N. Featherston and W. W. Brookes, for plaintiff in error.

Joel Branham and C. Rowell, contra.

v 84-15

BLECKLEY, Chief Justice.

1. The controlling legal question involved in this case was decided when the case was here upon a former writ of error. *East Rome Town Co.* v. *Brower*, 80 *Ga.* 258. The question then left open was one of fact, viz., whether the records of the corporation touching this contract were properly made and spoke the truth. They would speak the truth, if in truth and in fact there was a called meeting of the stockholders of the corporation held on the 8th of October, 1877, at which were present Brower, Nagle and Smith, and if in truth and in fact "The following proposition of A. Thew H. Brower was accepted to wit: A. Thew H. Brower to pay $3,000 in three years for that portion of the company's land known as the 'Hamilton Place,' bounded by the Selma, Rome and Dalton railroad, the county road and the Etowah river, being twenty acres more or less, the company reserving the land occupied by the bridge-keeper's house, and land enclosed connected with the bridge-keeper's house and used by the bridge-keeper for garden, etc. at this time; the property sold being designated on the company's maps by $w+\frac{N}{\underset{S}{E}}$, bounded by railroad, river and county roads as before mentioned." We have examined the evidence adduced on the second trial, and are well convinced, not only that the jury were correct in finding as they did upon this question of fact, but that they could not have found otherwise; in other words, that the evidence constrained the verdict upon the element of contract. It is needless, therefore, to scrutinize the charge of the court; for the verdict being right, nothing wrong in the charge could vitiate it.

2. The minutes of the meeting above referred to, though entered in the book several months afterwards, were so entered by the secretary of the corporation

under Brower's direction, and consisted of a copy of notes or minutes kept and furnished by Brower himself; and therefore, these original minutes or notes having been destroyed, the book was properly admitted in evidence, whether it would have been good evidence under other circumstances or not. Brower was a stockholder in the corporation, both when his notes of the proceedings were taken and when they were entered in the book.

3. We see nothing to indicate that the point made here in argument upon the time from which the jury found that interest was to be counted on the rents or mesne profits, was presented to the court below. The grounds of the motion for a new trial that the verdict was contrary to evidence and to law, went to the whole verdict, and gave no intimation that there was any special complaint as to interest. Moreover, the evidence does not enable us to determine from what time interest ought to be computed. If the jury made any mistake in that respect, it ought to have been called to the attention of the judge below, so that in revising the brief of evidence he could have seen to it that the brief was full enough to enable this court to handle the question as a separate point. The only error assigned in the bill of exceptions is the refusal to grant a new trial, and we fully coincide with the court below in the opinion that a new trial should not be granted.

*Judgment affirmed.*